**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**RAUL GUADALUPE-BAEZ, et al.,**

**Plaintiffs,**

**v.**

**HECTOR PESQUERA,**

**Defendant.**

**CIVIL NO. 13-1529 (GAG)**

**OPINION AND ORDER**

Raúl Guadalupe-Báez ("Plaintiff" or "Guadalupe"), Ivelissa Báez, and Antonia Hernández (collectively "Plaintiffs") filed the instant action seeking compensatory money damages against named and unnamed defendants for the violation of their constitutional rights pursuant to 42 U.S.C. §§ 1983 and 1985, stemming from the shooting of Guadalupe by members of the Puerto Rico Police Department ("PRPD") and the San Lorenzo Municipal Police (collectively "Defendants"). (Docket No. 18.) Plaintiffs allege Defendants were reckless and grossly negligent during their intervention with Guadalupe, when they used excessive force in violation of the Fourth Amendment to the United States Constitution. Id. Furthermore, they claim Hector Pesquera ("Defendant Pesquera"), Superintendent of the PRPD at the time of the events, and other Supervisor Defendants, are liable for the negligent training, negligent entrustment, and negligent supervision of Police Officers A-Z, which amounts to deliberate indifference and reckless disregard of Plaintiffs' constitutional rights. Id.

Defendants moved to dismiss the above-captioned complaint. The Court agreed with Defendants' arguments that the allegations in the Plaintiffs' amended complaint lacked the requisite plausibility. Therefore, the Court dismissed the entire action. (Docket No. 29);

Guadalupe-Baez v. Police Officers A-Z, Civ No. 13-1529 (GAG), 2014 WL 4656663 (D.P.R. Sept. 17, 2014). On April 21, 2016, the First Circuit reversed the Court's determination as to the sufficiency of Plaintiffs' supervisor liability claim against Defendant Pesquera. Guadalupe-Baez v. Pesquera, 819 F.3d 509, 514-17 (1st Cir. 2016). On remand, the case continued onto discovery. On February 21, 2017, Defendant Pesquera moved for Summary Judgment. (Docket No. 64). Plaintiffs responded in opposition. (Docket No. 65.) Per leave of Court, Defendant Pesquera replied. (Docket No. 71.)

## I. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (citations omitted). The movant bears the initial burden of demonstrating the lack of evidence to support the nonmovant's case. Celotex, 477 U.S. at 325. Then, burden then shifts back to the nonmovant, who must establish at least one issue of fact that is both genuine and material. Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that the material cited by the movant "do[es] not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the Court finds that some genuine factual issue

remains, the resolution of which could affect the outcome of the case, then the Court must deny summary judgment. Liberty Lobby, 477 U.S. at 248.

The Court views the evidence in the light most favorable to the nonmovant, resolving all reasonable inferences in that party's favor, without making any credibility determinations or weighing the evidence. Id. However, summary judgment is appropriate when the nonmovant's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayagüez, 440 F.3d 17, 21 (1st Cir. 2006) (citation omitted).

## II. Legal Analysis

In support of his attempt to defeat Plaintiffs' supervisory liability claim, Defendant Pesquera argues that Plaintiffs erroneously attribute the conduct of police officers Soto Rolón and Calderón Vega to him. (Docket No. 64 at 12.) Defendant Pesquera argues that Plaintiffs have not pointed to any specific or personal involvement to substantiate their supervisory liability claim. Id. Defendant Pesquera also posits that the police officers' actions were justified under what are known as the "Graham factors." Following this reasoning, he contends that because his subordinate's actions cannot be found to have led to constitutional violations, he cannot be held liable in his supervisory capacity. (Docket No. 64 at 13.)

The Court first addresses Defendant Pesquera's argument that his subordinate's actions were justified pursuant to Graham v. Connor, 490 U.S. 386, 393-94 (1989). Defendant contends that the Court must first determine "whether the officers directly involved in Plaintiff Guadalupe's shooting could have been found to have employed force that was unreasonable to the circumstance" under to the Graham factors, before addressing the supervisor liability claims against him. (Docket No. 64 at 13.) The Graham factors are: (1) severity of crime at issue; (2) whether a suspect poses an immediate threat to safety of the officers or others; (3) whether a suspect is actively resisting

arrest or attempting to evade arrest by flight). Id. In conclusion, he contends that all three factors are met, thus the supervisory liability claims cannot survive. (Docket No. 64 at 13-14.)

Pesquera's Graham argument fails at this, the summary judgment stage. The Court cannot determine whether the officers' actions were justified given the existence of genuine issues of material facts as to how Plaintiff Guadalupe's July 2012 shooting incident took place. The record evidence shows conflicting versions of the shooting incident.[1] According to Plaintiffs, there were about seven or eight four-tracks and two or three vehicles, not five. (Docket No. 66.) Moreover, Plaintiffs object to Defendant's characterization of having been found alongside a fellow rider

---

[1] In his statement of uncontested facts (Docket No. 64-1) Defendant Pesquera provides the PRPD's version of the shooting incident. On the morning of July 9, 2012, at 12:11am, on Highway 181, km. 10, Quebrada neighborhood of San Lorenzo, two police officers (Ortiz Landrau and Reyes Navarro) were headed to the Palo Alto business in the Espino district then they saw five (5) four-track ATV's blocking the highway. The drivers noticed the patrol car, lined up behind one another, and drove down the highway. The last four-track, which was yellow, had two individuals on it. One of the passengers in the yellow four-track pulled out a weapon and shot towards the grassy area twice, causing the other drivers to turn around and go in a different direction than the police. A chase ensued.

Officers caught up to the yellow four-track, and instructed them to halt. The same passenger in the yellow four-track unloaded two shots towards the agents, and the agents responded with two shots towards the grassy area. Minutes afterwards, there was a report of a man called Guadalupe who said he had been shot by the police.

Police officers Soto Rolón and Calderón Vega heard through the patrol car radio that fellow officers requested backup around 12:30am. The other officers explained that the suspects were dressed in black, wearing masks, and firing shots. After driving towards the Quemados sector, Soto and Calderón found themselves facing two four-tracks, a yellow ATV with two passengers and a red ATV with one passenger. The individuals saw the officers and drove off, and the officers gave chase. When the officers commanded the individuals to halt, they turned and fired two shots at the officers. Because it was dark, Soto could not make out which four-track shot at them. The officers lost the yellow four-track after it took a sharp left turn at a sign that read *Quemados*, so they followed the red four-track, which was on highway 181 headed towards highway 183. Although the officers told the individual to stop, he kept going.

The officers and the individual then made it to a traffic light and stopped briefly. The red four-track driver reached the highway 183 fire station, made a left turn, and acted like he was reaching towards his waist. When the officers began to turn, the individual made a gesture akin to taking aim towards the patrol car with his right hand. It was then that Soto shot at the driver, believing that because he and his partner were already targets of previous gunshots, their lives were in danger. Officer Calderón believes that Sgt. Soto's use of the weapon was justified. When Sgt. Soto ordered the individual to put his hands up where he could see them, the individual then threw himself on the ground, face up, with his mask still on. Soon after, a patrol car from the District of Gurabo and an ambulance arrived. The officers verified that the individual was not armed, and that he had an open fanny pack on his waist.

before the officers shot at him. He says that he was actually alone with the patrol car.[2] Plaintiffs' version is supported by Guadalupe's deposition testimony (Docket No. 64-10), while Defendant's version relies mostly on PRPD investigative reports on the shooting incident that include statements by PRPD officers.[3] (Docket Nos. 64-2, 64-3, 64-4, & 64-5.)

Plaintiffs' proffered evidence is sufficient to create a genuine issue as to whether the officers' actions were justified. Resolving this factual issue, which is the prerogative of the jury, will help determine the outcome of Plaintiffs' supervisor liability claims against Pesquera.

The Court now turns to the second part of Pesquera's argument. Defendant argues that he is not liable because he did not have notice that the officers were prone to constitutional violations. (Docket No. 64 at 15.) He reasons that although Officer Soto had four administrative complaints, none of them were relevant to this case—two were related to domestic violence, for instance), and Officer Calderón had none. (Docket No. 64 at 15). Defendant argues that there is no evidence implicating either officer in episodes involving excessive use of force, and thus, there is no causal link between Defendant and the constitutional violation, therefore, Plaintiffs fail to establish their supervisory liability claim. (Docket No. 64 at 15-16.)

---

[2] According to Plaintiffs, the patrol car passed the group in the opposite direction and the group was not blocking the road. The "shots" heard by police were the result of one four-track backfiring, meaning that no shots were fired. Guadalupe saw a driver of a four-track stop voluntarily and the police officers got off from the patrol car aggressively and went after him. The group continued to an empty garage. Meanwhile, the group got word that the driver who had stopped voluntarily had been thrown roughly on the ground, hit and slapped by the police and arrested, at which point his four-track had been confiscated.

Guadalupe also asserts that the police were chasing him with no lights on, and that he made a sharp U-turn because the patrol car was close enough that there was a risk of him being knocked down. After being shot in the abdomen, Guadalupe fell on the ground.

[3] In his reply, Defendant opposes Plaintiffs' characterization of Defendant's SUMF's No. 1-44 as hearsay. (Docket No. 71.) Defendant argues instead that these materials were produced in response to Plaintiff's discovery requests, and that they establish the officers' state of mind during the pursuit. (Docket No. 71 at 2-3).

In opposition, Plaintiffs argue that: (1) Defendant Pesquera's arguments regarding the "heightened pleading standard" for supervisor liability claims were disposed of by the First Circuit in Guadalupe-Baez; (2) there is sufficient evidence that creates genuine issues of material fact as to Defendant Pesquera's liability as supervisor that render summary judgment inappropriate. (Docket No. 65 at 14.)

A supervisory liability claim has two elements: "first, the plaintiff must show that one of the supervisor's subordinates abridged the plaintiff's constitutional rights." Guadalupe-Baez, 819 F.3d at 514 (quoting Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008). "Second, the plaintiff must show that "the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference." Id. at 515 (quoting Lipsett v. Univ. of P.R., 864 F.2d 881, 902 (1st Cir. 1988)) (alterations in original).

Plaintiffs' supervisory liability claim against Pesquera is based on the theory of deliberate indifference. To establish a supervisor's deliberate indifference, plaintiff must satisfy a three part test. See Ramírez-Lluveras, 759 F.3d at 20. Plaintiff must show: (1) the supervisor had knowledge of the facts; (2) from which officials could draw the inference; (3) of a substantial risk of serious harm. Guadalupe-Baez, 819 F. 3d at 515 (citations omitted). In addition to deliberate indifference, a plaintiff must establish a "solid" causal link between the supervisor's conduct and the constitutional violation. Id. (citing Ramírez–Lluveras v. Rivera–Merced, 759 F.3d 10, 19 (1st Cir. 2014). Causation requires showing "the supervisor's conduct led inexorably to the constitutional violation." Id. (quoting Hegarty v. Somerset Cnty, 53 F.3d 1367, 1380 (1st Cir. 1995)). A plaintiff can meet this difficult standard, for example, by proving inaction despite a "known history of widespread abuse sufficient to alert a supervisor to ongoing violations." Maldonado–Denis, 23 F.3d at 582 (citing Ramírez–Lluveras, at 19). "[D]eliberate indifference alone does not equate with

supervisory liability." Figueroa–Torres v. Toledo–Dávila, 232 F.3d 270, 279 (1st Cir. 2000) (alteration in original) (quoting Camilo–Robles, 151 F.3d at 7). "Causation remains an essential element, and the causal link between a supervisor's conduct and the constitutional violation must be solid." Guadalupe-Baez, 819 F.3d at 515 (citing Ramírez–Lluveras, 759 F.3d at 19.)

In support of their supervisory liability claim, Plaintiffs argue that there is a genuine dispute of material fact as to Pesquera's supervisor liability. (Docket No. 65.) Namely, Plaintiffs point to Defendant's interrogatories as a sign of nonchalant and deliberately indifferent conduct that would bolster their supervisory liability claim (Docket Nos. 65 at 9; 64-8) because it evidences Pesquera's reckless disregard, as he stated that he was not even aware of Guadalupe's shooting or the incident with Soto. (Docket Nos. 66 at 23 ¶ J; 64-8 ¶ 7.) Plaintiffs allege that Pesquera did nothing to respond to Officer Soto's violations, and that he failed to institute procedures to evaluate and respond to complaints of violence by his subordinates. To wit, Plaintiffs posit that Pesquera's knowledge of widespread abuses in the police force during his tenure, as well as his failure to train, supervise, and control his police officers, reveal his inaction in the face of a crisis. (Docket No. 65 at 10.)

As recognized by the First Circuit in Guadalupe-Baez, Plaintiffs contend Pesquera's inaction, together with the Report of the *Investigation of the Puerto Rico Police Department* by the Civil Rights Division of the United States Department of September 5, 2011 ("U.S. DOJ Report"), is enough to find a causal link between Defendant's action (or rather, inaction) and the violation of Plaintiff Guadalupe's constitutional rights. Id. at 11-13. "The existence of the Report put Pesquera on luminously clear notice that he might become liable, in his supervisory capacity, should his acts and omissions contribute to the continuation of the pathologies described in the Report." Guadalupe-Baez, 819 F.3d at 517 (citing Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011)).

Plaintiffs' pleadings "when combined with the Report, . . . [are] enough to get Guadalupe across the plausibility threshold: such random and anonymous violence appears to be a predictable culmination of the systemic problems documented in the Report. In this instance, . . . the Report plays a critical role in bridging the plausibility gap." Guadalupe-Baez, 819 F.3d at 516–17.

> As Superintendent, Pesquera bore the ultimate responsibility for overseeing and directing all administrative, operational, training, and disciplinary aspects of the PRPD. An appreciable amount of time elapsed between the issuance of the Report and the shooting. Guadalupe alleges, though, that Pesquera continued—or at least failed to ameliorate—policies which cause the pattern and practice of use of excessive force. When this allegation is evaluated in conjunction with the rampant constitutional violations limned in the Report and the parade of horribles allegedly visited upon Guadalupe, a plausible inference exists that Pesquera either condoned or at least acquiesced in the offending conduct—conduct that is affirmatively linked to the harm Guadalupe suffered.

Guadalupe-Baez, 819 F.3d at 516. The First Circuit went further and stated that arguing lack of knowledge would constitute deliberate indifference. Any claim by Pesquera that he was unaware of the substantial risk of the serious harm that befell Guadalupe would constitute deliberate indifference to the reality of the dysfunction that Pesquera inherited when he took over as Superintendent of the PRPD." Guadalupe-Baez, 819 F.3d at 516 (citing Ramírez–Lluveras, 759 F.3d at 20; Maldonado–Denis, 23 F.3d at 582.)

There is room to argue that Pesquera should have been on notice that the officers were prone to constitutional violations. While Officer Calderón's record is clean, Officer Soto had four complaints against him. In addition, two of his previous violations have some relation to this case—negligence and domestic violence. That, arguably, should have put Pesquera on notice that there was a possibility that Soto would be involved in future episodes of use of excessive force, particularly when the U.S. Department of Justice's Report stated that the problem was widespread and pervasive. The question of whether Officer Soto's behavior was a pattern of violent behavior

considering his four previous complaints is key to the resolution of this case, and it is for the jury to decide.

Guadalupe has established a genuine dispute of material fact as to whether Pesquera condoned or at least acquiesced in the offending conduct—conduct that is affirmatively linked to the harm Guadalupe suffered. Guadalupe's testimony, Pesquera's statements, and other evidence on record, if credited by the factfinder, would allow a reasonable jury to conclude that the Superintendent of the PRPD reasonably would have known that substantial risk of a constitutional violation existed. See Fernandez-Jorge v. Galarza-Soto, No. Civ, 14-1590 (GAG), 2017 WL 2534126, at *10 (D.P.R. June 12, 2017).

Lastly, the Court turns to Defendant's final argument. Surprisingly, Defendant raises the qualified immunity card despite the fact the First Circuit addressed this issue. Plaintiff opposed. (Docket No. 65 at 13.) The First Circuit already determined that Defendant Pesquera cannot claim qualified immunity. See Guadalupe-Baez, 819 F.3d at, 517 ("Because the Report put Pesquera on clear notice of his potential liability, Pesquera cannot satisfy one of the showings required for qualified immunity.")

## III. Conclusion

After carefully reviewing the parties' submissions and pertinent law, the Court **DENIES** Defendant Pesquera's Motion for Summary Judgment at Docket No. 64. According to the evidence on record, genuine issues of material fact arise from the parties' submissions, making summary judgment improper.

**SO ORDERED.**

In San Juan, Puerto Rico this 28th day of August, 2017.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge